Good morning. May it please the Court, my name is Martha Hall. I represent Mr. Banks, Robert Banks, a.k.a. Pimpsy, in this case. I will be spending the eight minutes in my opening argument on the illegal arrest and traffic detention, the expert testimony of with regard to witnesses Arianne and Kara. My co-counsel, Mr. Lemon, who represents Mr. Brown, will address the statute of limitations, pre-indictment delay, destruction of verbatim statements that violated Jenks in the due process, as well as the erroneous admission of the summary and expert Johnson and the false testimony of Arianne and fraudulent tax returns. Okay, so you didn't list the definition of the enterprise, which I think was maybe what we were planning to ask about. So which of you should we ask that to? That would be me. Okay. And I would say that the issue on the enterprise also segues with the jury instruction, which Mr. Lemon briefed on behalf of Mr. Brown and we joined in it. So the main problem here is whether or not the government showed that the conduct of the defendants, and we can say that the conduct was not good, that the conduct of the defendants was for the purpose of to facilitate the management and operation of the enterprise. And I'm taking that facilitate the operation and management of the enterprise from the jury instruction from Young that it does go directly to the issue that was hotly, one of the issues that was hotly debated. So do you think the instruction was adequate or do you think there should have been a more fulsome instruction on nexus to a criminal purpose or cooperation in a criminal purpose? Oh, I think there should have been a more fulsome. Was one asked for? Mr. Lemon proposed an instruction and it, unfortunately. And how was it different? And where in the record is that? It appears and I will defer to him because he's more familiar with that issue. However, if I'm correct, I believe that the critical statement was omitted, perhaps unintentionally by the district judge in the actual instructions given. But I'm going to defer those facts to Mr. Lemon. So I hadn't understood his argument about the words that were omitted from what was agreed to what was said out loud to really deal with what you have in your brief about whether these people were really acting as independent criminal actors or whether they were cooperating together in an enterprise. I don't really think the omitted words speak to that very clearly anyway. Well, perhaps they're not clear because they're legalistic. The facility to facilitate, you know, the intent to facilitate the operation and management of the enterprise, to me, is the intent that your conduct furthers the purpose of the enterprise. But I thought your argument went more to does the purpose of the enterprise have to be some sort of cooperation in criminal activity? I mean, if the enterprise is a group of friends, I thought your point was that's not enough. So I don't know. I mean, anyway, we can... Right. No, that's true. You are correct that that is a large part of my argument. The problem is we don't have an instruction that tells a jury a group of friends is not an enterprise. You know, it is presented to the jury in, unfortunately, legalistic terms. And we believe that those terms go to part of the problem in this case. I think that there were several problems with the enterprise. But one of the main problems is that the government just did not go beyond proving socializing and friendship of these individuals who grew up in North Park. So they proved a club but not a gang? Not an enterprise? Yes, that's exactly what we would say. And even the... But you were able to argue that to the jury, weren't you? Well, part of the problem is that I don't think that the instructions adequately addressed it, number one. And number two, we had these experts coming in. One, an unnoticed summary expert, Johnson, that Mr. Lemon will address. And the other, which is Detective Reish, who came in and testified. And their testimony really was problematic. And I will talk about Detective Reish because he's the one that I addressed. His testimony about the fact that they were all part of a criminal gang was really based on social media. You know, he would talk about looking at these texts and hashtag black mob and hashtag scandalous means that they were one unified criminal gang. And there are two problems with that. One is he's testifying based on social media. And the other is he's invading the province of the jury. He's not testifying based on any expertise that he has. And as a matter of fact, the expertise that he had about what constitutes a gang, what are the indicia of gangs, all of that weighed against finding that this artificial construct, black mob, scandalous, was a gang, a criminal gang. All of it weighed against finding even that scandalous was a gang. He claimed that he recalled that scandalous had at one point been documented, but he had no evidence of that. He talked about different ways in which it was not a normal gang. It wasn't territorial. It didn't get in fights with other gangs. It got along well with both the Bloods and the Crips. Let me offer you an analogy and just get your reaction to this. What if instead of pimps we had street drug dealers? And they occupied different corners within a defined territory. And within that territory, they established a relationship. They celebrated the fact that they were all in that territory. They advertised it to the world through tattoos, insignia. They, on occasion, worked together, as in offering rides to prostitutes and offering legal assistance in case an arrest occurred. And they used events like a drug dealer's ball to say to the world, we own this part of the territory. But they're each individual drug dealers. They don't share their profits. They may not have a common source. They don't have common customers. Indeed, they compete for customers. Are they acting independently like your clients, or are they part of a gang that has the purpose of either helping each other in certain aspects, or working together to entrench their control through reputational enhancement over a particular territory for a common criminal purpose? We're all pimping here, or we're all selling drugs. Right, so you really have to get into the weeds on it, because if you had all these in San Diego as a place to go for drugs, and we're all here waiting for you. All right? That's one thing. Didn't the player's ball help do that? No, absolutely not. In fact, the player's ball goes the other way. Mr. Banks goes to the player's ball, and he, at no point, is seen advertising scandalous or black mob scandalous. All his providers of sexual services, his prostitutes, the testimony is that they often tattooed themselves to identify themselves with a particular group? I'm sorry for interrupting you. I guess I'm getting a little excited. There was no prostitute who had a tattoo that related to Mr. Banks. The tattoos related to the Mr. Pittman, who was not even on trial. He was alleged to be a member of the enterprise, but he was not on trial. What was the evidences to their relationship? Well, the tattoos were not of scandalous or black mob. The tattoos were Team Tip, Tip being a nickname for Pittman, or Miss Lucy, another nickname for Pittman, but not scandalous, BMS, not even, you know, North Park or North, which the prosecution wants to focus on. What I'm having trouble is, why aren't all these questions questions for the jury? You know, you could say, well, this isn't enough for you to decide that this was a common enterprise, or something like that, but the jury has to infer from the evidence. Right, so our argument is initially that it's just insufficient, but in addition, I think that it does provide the foundation for finding that the jury instructions, the erroneous jury instruction on an enterprise was prejudicial, leaving out certain information that was critical to the argument that these, you know, that just independent conduct by itself does not make an enterprise. If we don't find a problem with the jury instructions that made, that was outcome affecting, does your argument on sufficiency weaken? I don't know if the argument weakens. I would just say that it probably is not as strong as some of the other arguments in the case. Oh, go ahead. So the jury was told it's not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. Rather, the government must prove that there was a plan to conduct or participate directly or indirectly in the affairs of the charged enterprise through a pattern of racketeering activity. So do you think that's not enough, or do you think the issue is that the jury just was swayed by the inflammatory evidence and found that was met when it wasn't? I think I would choose door number two. I think that the inflammatory evidence was really very overwhelming. I think the evidence that it was overwhelming came at the very beginning of the government's closing argument, where she says to the jury, you probably feel like you're in the matrix and you've taken a red pill. That reflects, I think, how inflammatory the videos, the expert testimony, and all of that evidence was in this case. So, because you keep pointing to this other jury instruction, but in what way would that have helped with adding to what I just read? I mean, it seems like what I just read is at least related to the argument you're making. It's related to the argument, but I think... Much more than the phrase that was omitted. Well, I think that the problem is that the phrase that was omitted tells the jury how they need to find that any individual conduct did assist or could be said to be evidence of the enterprise. Does that make sense? They have to intend to facilitate the enterprise, right? They were told one becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy. I mean, I'm just not sure that this omitted phrase is different than what was read or better than what was read. Maybe there's some other instruction that you'd like us to say should be in the instructions, but I don't know what that was. And if it's not that, then it seems like your argument, if I understand it, is more the videos, the text, whatever... 403. Inflamed the jury, and then they went ahead and convicted under this standard that actually was okay, but they did it erroneously. Yes. So then it becomes a 403 argument. I think the 403 argument is one of the strongest arguments with all of the very offensive expert testimony and then the videos that were omitted. So I was trying to figure out if that's your argument. I mean, so the arguments are kind of intertwined, but you have this argument that the jury, there was really no evidence of this cooperation. It's their independent actors. But then you also have this, the videos are inflammatory argument. I mean, what do you think, if we were open to the idea of reversing the RICO count, which of those is better? I think the 403 is actually better. I think that that is a very strong argument. The amount of impermissible, inflammatory, and prejudicial information that came in through the experts and the videos was just very, very troubling. Okay. And I see that... We still have some more questions, I think. Let me just ask you what you think of the potpourri we have of arguments here. What do you regard as the strongest argument in your favor? Actually, the strongest argument in my favor, I think, is the illegal arrest and prolonged traffic stop. And then very close to that, I think, is the cumulative effect of the admission of Johnson, the summary, Detective Johnson, who got up there and told the jury how he had spent hours and hours looking at, you know, millions, not millions, but thousands of social media. I mean, his self-aggrandizing account of the investigation really set the tone for the runaway train, so to speak. Johnson and... As to the arrest argument, isn't driving without a license a misdemeanor? And at that point, can't he be arrested? I don't understand why you think that's your strongest argument. Well, the problem is they had... The problem is when did they know that he was driving without a license? Well, didn't they know immediately? No. And I went back and reviewed the transcript last night. What happened, the testimony of Scallon, who was the one who was living, because the other one had died, the testimony of Scallon was that as soon as they pulled him over, he ordered him out of the car, ordered him back to the police vehicle, patted him down, put hands on him before anything else. Under Knowles, the U.S. Supreme Court, at the moment he patted him down, he needed reasonable suspicion for a crime, and he didn't. The only thing he had at the time he put hands on him was an unsafe lane change. So you don't think he asked for his license and registration at the first encounter? That's usually what would happen. He did not testify. There's no evidence that he did that. And quite... Didn't he ask for ID? No. These were two crime suppression officers who pulled over a car with four black individuals in Los Angeles on Sunset Boulevard. They were not traffic cops. He did not ask him any of the traffic questions. He told him to come back to his car, patted him down. The testimony of Scallon said, patted him down, checked for ID, no ID, handcuffed him, put him in the back seat of the car. He was actually questioned on cross-examination several times about, you know, when did you find out that he was unlicensed? And at no point did he say, he told me he was unlicensed at the stop, or I found out that he was unlicensed at the stop. And as a matter of fact, at one point, when he's asked what further... At one point, he testifies, Scallon testifies, upon further investigation, we learned that the person driving the car was unlicensed. Then there was the question, what was the Scallon goes off on a tangent and says, talking to the juveniles in the vehicle, which was non-responsive about the unlicensed status. And that's at Banks ER 118. And at Banks ER 117, he indicates, Scallon indicates, that the determination that he was unlicensed was made when Cottle, the deceased officer, completed his report, which would have been back at the station, which makes sense because he probably waited until he got back to the station to run the computer check. There was never a traffic citation issued. At what point did he find that there was no license on him? I mean, you seem to be making a distinction about between being... He had no license as opposed to he didn't have the license with him. Well, I think that that's a critical distinction for whether or not a crime was committed. He said, checked for ID, no ID, after he patted him down. Okay. So it's that, but it was at the scene. It was at the scene. Standing next to the police car. Correct. But not having your driver's license is not the same as being unlicensed. Not having your driver's license on you is not a misdemeanor. And he could not have then legally arrested him for the commission of this crime. And when he's pressed on the critical issue of when did you learn that he was unlicensed, he goes all over the place, starts talking about the juveniles, and then says Cottle found out when he completed his report, which would have been back at the station well after the 30-minute detention. And that's why that conduct at the police car constituted an arrest. How much after that did the officers learn that the girls were underage, but they understood to be the purpose of the trip? So Scallon said that it took about five minutes to handcuff Banks and put him in the back seat of the car. That's an arrest under all Ninth Circuit law. Then they go over to the car to question the juveniles, which was the questioning was conducted by Cottle, not by Scallon. Cottle, the one who wrote the report, who is now deceased. Cottle, in his report, nowhere says that the juveniles in the car said they were there to be street walked. He only says they had changing stories about their ages, and therefore they wanted to take the passenger of the car and the juveniles down to the station to find out if they were contributing to the delinquency of a minor. There was no evidence at that, according to Cottle's report, at the scene that they were being street walked. Could I ask you back on the RICO count? So hypothetically, if you persuaded us that there was a problem with the RICO conviction, what does that do to counts two through five? They have to be reversed because of all of the evidence that came in to prove the RICO. You have evidence of other persons' Pittman and Williams prostitution in Hawaii and Denver. You have the big map, you know, that Johnson testified with all the pinpoints everywhere about all the cross-country pimping. You have all of the expert testimony about pimping and prostitution, which was relevant to the RICO, and you have the gang testimony, the gang testimony that came in to prove the RICO, which is very prejudicial. None of that would have come in, especially other people's crimes and their association with Mr. Banks. And his other pimping activity would not have come in to prove those counts two through five. And Mr. Lemon has an excellent argument on the pre-indictment delay and statute of limitations. I know we should turn to that now. That's right. Good morning, Your Honors. John Lemon for Tony Brown. In March 2001, Mr. Brown was arrested in Los Angeles on suspicion of pimping three minor females. The DA in Los Angeles declined to prosecute that case, specifically citing insufficient evidence. Sometime thereafter, the videotaped statements of the alleged victims were destroyed. And that was routine? Apparently. I mean, we really don't know. That, I believe, was the proffer of the U.S. Attorney's Office, but we don't really know. In 2010, the investigating officer who interviewed the alleged victims and who wrote all the reports was killed in Afghanistan. In November 2014, almost 14 years after the incident, the U.S. Attorney's Office for the Southern District pulls the LAPD case file from storage and charges Mr. Brown in the superseded indictment with three counts of child sex trafficking. And about 24 other people, as I understand it. Well, except these three counts were specific to him. So I'm focusing on these three counts right now and not the rest of the indictment. But in November 2014, they indict my client and Mr. Banks on these three counts for sex trafficking based on this incident from 2001. At trial, we were unable to impeach any witness, whether it be the alleged victims or the surviving officer, with any inconsistent statement because the verbatim witness statements had been destroyed and because the investigating officer was deceased. So the two questions before this court are, number one, whether the destruction of verbatim witness statements videotapes of the alleged victims' actual prejudice, and number two, does a capricious 14-year delay in prosecution favor the United States? So again, the standard of review here should be de novo because it is a failure to preserve at least potentially exculpatory evidence, if not clearly. It wasn't the United States that destroyed the evidence, though, right? Well, it was destroyed because they didn't prosecute in a timely fashion. I believe, again, there was really never any evidence on that. But I believe the prosecutor proffered that by the time they got around to asking LAPD for it, it no longer existed. So it wasn't the United States that destroyed it? Well, I think they were certainly a but-for cause of it. The statements would still exist had the United States prosecuted the case in a timely fashion. Until they decided to pursue the case, was there any obligation on the United States' part to ask LAPD to preserve any evidence relating to the 2001 arrests? Well, I mean, I think that kind of stands this question on its head. I mean, this is that we have a prosecution. We have to find out if there was a duty, I mean, a constitutional duty that was breached, don't we? Well, I mean, I think that's the inquiry this Court is undertaking now, was this prejudicial pre-indictment delay. And again, the – But what is the evidence that the United States had its theory? I mean, you have an argument that they don't have a theory anyway, but assuming they had a theory about RICO, what's the evidence that they sat on it for 10 years? Because they testified at several hearings. Their agents testified that they began their investigation into what they characterized as black mob slash scandalous sometime in late 2012. But we don't have any evidence that the videos still existed in 2012, do we? I mean, that's way after. It seems like they didn't exist at that point. I don't know. We certainly have no evidence that the government had any control or possession at that point. Right. And the officer was already dead at that point, right? He died in 2010. Yeah. Right. But, I mean, I think that underscores why the government shouldn't prosecute people 14 years after the fact. Well, so this is – it seems to me that your argument, this cluster of arguments, is more like you shouldn't have a statute of limitations for this kind of sex crime that goes on this long, and there's a due process problem with prosecuting such old crimes. But you didn't make that argument. This is – well, I made a statute of limitations argument. But it's a different one. Yes. Yeah. So isn't it more in that, in the nature of that, that it's just – it seems like your argument is fundamentally it's just unfair to prosecute someone this long after the fact when everyone has forgotten what happened. No, I think it's unfair when you have a delay that is this extreme, which is unlike any delay cited in any case by the government. But delay isn't really the problem because by 2012 it's too late. So your argument, I think, is more like you just can't wait this long, whether it's delay or just not delay, but whatever it is, it's too long. The problem is we have – I keep coming back to this, but the reference point for this entire analysis is that these are verbatim witness statements. But for the delay, this would be a Jenks Act violation, clearly. But the delay only started in 2012, and the things were gone by then. I don't understand. There's a 14-year gap between the indictment. That's the it's too long. In the incident. Right, that's the it's too long from the incident. You don't know when the tapes were destroyed. All we know was that at some point one of the prosecutors came to court and said we don't have them. We think they were destroyed. But without – so I'm using delay to mean some kind of intentional waiting. There's no intentional waiting until 2012, and we have no evidence that the videos were destroyed after that. So it seems like your argument isn't really intentional waiting. It's some kind of it's just been too long. It doesn't have to be intentional. The cases are pretty clear that negligence is a violation. But there isn't even negligent waiting. I mean, there's no waiting until 2012. Because we know that the investigation into the scandalous and related mob, allegedly related mob, or gang, club, whatever, did not begin until 2012. There wasn't any intent to – knowing of the criminal activity of these individuals associated in this fashion, there's no evidence of let's just wait until our investigating officer dies and the videos get destroyed, or let's sort of forget about it, get distracted and do other things, and then later, after more time than due process allows has expired, go back to it. Having dropped the ball, your negligence point. But that's not my client's fault. It's the government has an obligation to prosecute people in a timely fashion or don't do it at all. That's what limitations tell us. Well, except the statute of limitations, the cases also say don't resolve this issue in every case. Well, just help me out. What is it that the federal government did wrong here? They waited long enough for verbatim witness statements to be destroyed, and now they are using the fact that they waited this long to prosecute the case to justify it. Yeah, let's assume that it's the routine practice of the San Diego Police Department. Once a decision is made not to pursue any criminal charge because they have determined insufficient evidence at that time, that it is their routine practice sometime within a short period after that to get rid of the evidence because they're not going to do anything with it. At what point did the federal government have an obligation to say, oh, wait, I'm going to go after these people, and I'm worried that the local investigators who have decided to drop the ball may be getting rid of their evidence, so we better move? Should they have done that in 2002, 2003, 2004? I don't think the inquiry has anything to do with the government's obligations. The question is, is there prejudice? You just said it didn't, I thought, and maybe I misunderstood you. No, I'm saying that, okay, there's two prongs here. One, is there prejudice? Yes, there's clearly prejudice because verbatim witness statements of the alleged victims have been destroyed. This would be a Jenks Act violation certainly had the statements ever been in the government's possession. That's a separate question I can get to in a minute. But there's certainly prejudice. The second is you balance the delay against the reasons for it. So we have an extraordinary delay of 14 years, which is unlike the delay in any other case that's cited by the government. But it's a length of time, not a delay. It can't be a delay in the sense of intentional delay until the federal government even starts thinking about it, which didn't happen until 2012. Well, I disagree with that because the definition of delay is not an intentional delay. It could be negligent, a failure to pursue something in a timely fashion under the case law. But that has to be a duty that's breached to be negligent, and there's the duty. It seems like maybe if you have other arguments you should move on to something else. If you want to use your last minute on another point, I don't know if you do. Okay. Well, I guess I'll save it for rebuttal. I didn't get a chance to address the statute of limitations. But save it. Okay. Good morning, Your Honors. May it please the Court, Mark Ray for the United States. Trying to think of where to begin here. Maybe one thing I'd like to start out with, because I'll treat it quickly, is the Fourth Amendment claim. Because I think I have a cite for that. Banks' excerpt of record, pages 116 to 117. Because the issue there is about at what time did they find out that he did not have a license in his possession. I'm going to read verbatim, and it's quick. Not licensed in his possession or unlicensed? Not licensed in his possession, which we would argue is still probable cause that unlicensed. To arrest to have probable cause, you know, if somebody doesn't have a license in their possession, we would submit that that's enough. Is that a misdemeanor? Yes, under Cal Vehicle Code 12. Well, only if there is no license anywhere, though, right? Ultimately, that's true, Your Honor. But as far as probable cause for the arrest, but I do want this factual point. So what you're saying is that, if I understood you correctly, that once there was no license in his possession, it was reasonable for the officer to at least be suspicious that there was no license at all. Exactly. Is that what you're saying? Well, we would find that it would actually come to probable cause, Your Honor. Okay. So anytime I get stopped because I ignore the stop sign because I'm thinking about a case, and I have forgotten my license back in my other purse, an officer is going to look at me and say, You know, I've got probable cause to believe you just don't have a license. Is that what your argument is? Well, that doesn't sound good when you put it that way. I'll be the first to admit that. But I would say it's not just that he didn't have a license. He also didn't have an ID. But at least I believe that Banks' excerpt of Record 116 to 117, it is clear that this did the fact that he had nothing on his possession was adduced immediately. And the question is, what did you do after you had the driver come back to your car, made contact with him, patted him down, check for weapons, check for ID? He didn't have any ID. Next question, did he have a driver's license? Answer, no. And later at the bottom of the same page, at the time that you encountered the defendant by your patrol car or the person who identified himself as Mr. Kelly,  I don't recall any driver's license. At what point, what was the necessary information or inferences that the police officers had to have before they could pat him down under this circuit's law? Right. Usually there has to be some kind of reason to believe that the person poses a threat. And it doesn't look like that was present on this fax. But I would say this, too. A threat of what? A threat to the officer's safety. In my circuit, it is almost routine practice to pat someone down just to be sure they're not armed. If you ask someone to get out of a car. And it is not constitutionally offensive to, in some cases, if you have enough information to ask someone to get out of the car and follow you to a police car, and they are standing right next to you, then you have an ability to check for weapons to be sure that officer safety is not compromised. Understood. So you're saying that that would not be the case under Ninth Circuit law? I don't believe at the time of this incident it was that clear. But my understanding is that in recent years, the Ninth Circuit has sort of parsed that out. All right. Thank you. But, of course, we know under Pennsylvania v. Mims from the late 70s, an officer definitely has the right to ask the person to come out of the car. But, you know, our point here is that nothing came of that pat down and that they immediately asked for the license. There was no license, and that much is at least clear from the record. And, of course, we still stand on the point that this argument, as far as the arrest is weighed, in the district court, the only argument that was made was that it was an unlawful prolongation. And here we would say the overall, you know, you have somebody, as we say in our briefs, doesn't have a license. Turns out nobody in the vehicle has a license. And the record, you know, is also, if you review that pretrial suppression hearing testimony of Officer Scallon, he testifies that the girls in the back seat of the car indicated that they were there to be street walked in Hollywood. And I know the defense tries to quibble with how that conflicts with the arrest report. All that went to weight and credibility. It's not enough to do or to find a suppression. So I at least wanted, I feel like that part of the record was clear from Banks' excerpt of record 116 to 117. Now, moving on to the definition of the enterprise, my understanding of the record, the primary dispute, the parties below, were about the three Boyle factors. That was what was litigated pretrial. Of course, the Supreme Court in Boyle in 2009 says, in association, in fact, enterprise has to have the three elements, a common purpose, relationships amongst those associated, and longevity. And this Court has made clear, in Christensen's case, it's not a very demanding definition, that it should be, it has wide reach and it's to be liberally construed to effectuate its remedial purposes. And in this case, all of the facts were put forward to the jury. I believe Judge Friedland, the portion of the instruction that you read earlier, it completely allowed the defense to make their primary claim that these people were just friends. But, you know, what we wanted to point out, I mean, when you look to the relationships prong, these gangs, you know, the question, I think, kind of... So, but do you agree that the individuals in this enterprise, that you're alleging, needed to be working together or agreeing together to help each other commit crimes? Yes. Okay. So what is the evidence that they did that? Well, first of all, and I know, I believe Judge Rosenthal touched on that, through their social media, they give themselves a certain prestige. And what they do, what we pointed out, it's not just, you know, there were a certain amount of black mob members that were discussed and evidence thereof and a certain amount of scamless members. They don't just say, hey, I'm scamless, yay, scamless, or hey, I'm black mob, yay, black mob. There were plenty of examples put in front of the jury where they're together. Like, you have the picture. Yeah, but how do we tell the difference between them being together at a party and being together to defend territory? Well, I think, you know, first of all, by volume. Not by criminal purpose. Right. I think, first of all, by volume. You know, it's not just that it's an occasional... No, no, but volume doesn't help you if none of it is what we're talking about. So where is the evidence that they were working together to defend a territory for pimping? Well, first example, you have a subset that comprised members of both of them, the YPFAB clique. That was testified... Okay, but if that was the enterprise, that's not what was charged. Well, not per se, but the black mob scamless working together was charged as an enterprise, and this was a subcomponent. I think it was within the jury's... Well, so how do we have evidence that everyone in black mob and scamless were working together or had an agreement to further, if the theory is, preserve a territory, maybe the theory is some other thing. I don't know what your idea is of what they agreed to do. What is the theory of what they agreed to do that helped each other with this crime? Well, you know, you have evidence that, too, like when one of them got arrested. I believe it's supplemental excerpts of record 1109 to 1115. Christopher Walls, he's in the back of a police car. He's talking to banks. They're talking about, this is how we beat the case. I think that's important evidence. You also have supplemental excerpt of record 1067 to 1108. So is helping after the fact helping to commit the crime? Well, I think at that point, because they don't know that it is a done deal, and I think it does. I think it's something the jury can infer. It's not like, you know, I believe the prosecutor argued in closing. It's just like, oh, what are you doing in this police car? Oh, I got arrested for a pit meet. It's like, look, they're talking about common cases. One of them is talking about I had a case like this. You've got to make sure with the juveniles that you don't get attached to them. I mean, it at least shows them working together. Okay, well, can you give any other example that actually goes to committing the crime rather than helping someone get out of jail later or not be prosecuted later? Yeah. I believe, you know, we had evidence, too, that, you know, you had the evidence of in October of 2012 in Phoenix. Yesenia Armentero testifies that she's there with her pimp, Aaron Pittman, at the same time that. This is the Waffle House? The Waffle House, exactly. So at the Waffle House, I mean, even if they're all at dinner and they witness one man telling one woman go put an ad, how does that show that they've made an agreement to help each other do that? Well, I think by acting in concert. I mean, maybe now I don't know that, you know, I don't know that RICO, maybe when I agreed to what you asked me a few minutes ago, I mean, I don't know that it requires that level of specificity. Go ahead. You know, just under Boyle, I mean, you've got the three factors. You've got the common purpose, the relationships, and the longevity. But so what is the common purpose? To promote prostitution. I mean, and that's one of them. In the North Territory? In the North Territory. You know what, it wasn't just that. You also had the, I think it was a March 2000 incident where they sold crack cocaine. You had Tony Brown together with members of Blackmon. This was basically a pimping case. But that was the central purpose. And what about the evidence of shared rides? Sorry. How does that play into your theory? Was it frequent enough to support the jury verdict? By shared rides, I don't know if I understand what you mean. That they rode together, traveled together in a single car to take more than one prostitute to Las Vegas or to come to a players ball or something like that. Well, I mean, it shows them acting in concert for the same purpose. And, again, like when you look at the social media, it says Black Mob plus scandalous. We're all we've got. I mean, I think you can, at least on a sufficiency review, looking at the light most favorable. I mean, it doesn't have to be the strongest case. It just has to be something that a rational jury could find. But when you say the purpose was promoting pimping. So, I mean, if someone wrote a book saying pimping is a great enterprise. Sorry, enterprise is a bad word. Pimping is a great thing to spend your time doing. That would be helping each other in a relevant way for RICO to be an enterprise together? I mean, even if three of them wrote books about how pimping is great, how is that? That doesn't seem like enough. Well, and maybe by itself it's not enough, Your Honor. But here what you have, you know, and you have evidence. They said we've been doing this since the 90s. You have them together. They're celebrating. They go to players balls together. Yeah, but that's like writing a book, isn't it? I mean, what's the difference between the players ball and writing a book? Well, in and of itself, I mean, it's more concrete activity. I mean, you know, book is an idea. It could say, hey, you should go out and pimp, but I'm not going to do it. A players ball is these defendants with their prostitutes actually going to an event that celebrates what they do, which is illegal, and, you know, they're there together. There's a picture of Aaron Pittman with Yossini. I mean, it's not just something that's in the ether or a First Amendment issue. It's evidence that each of them individually was engaging in pimping, but how is it evidence that this entire Black Mob, Scandalous group was helping each other? Because, you know, I think it's something that the jury can infer. They are in the same territory. Every time, you know, a lot of times they're using social media. They say Black Mob plus Scandalous. Like, it's never individual. Well, tell me the rule in your mind of the combination of the players ball, which sort of celebrates publicly, come with us and you'll make a lot of money, or stay away from us because we really run this part of the world for a criminal purpose, and the various social media exchanges in which they show huge amounts of cash and celebrate that as the proceeds of their illegal activity. How does that sort of shared publicizing of their reputation, their success, their power over their prostitutes, how does that specifically help you in your burden of proof? Or not? By showing, you know, telling the world, and look, we're strong. Come join our gang. This is what we do, and we're very good at it. They're bragging about it, and they get prestige and recognition out of it. Who comes to the players ball? And it's all part of membership in the gang. Who comes to the players ball? Who are they advertising to? I mean, that's a good question. Not having ever been to one, I think there's going to be a certain amount of looky-loos, but they're obviously giving out awards. But it sounds like you're saying they were recruiting. Was there evidence that they were recruiting? Well, not direct, but I'm saying this could be, I think, a permissible inference from the evidence for the jury to draw a rational conclusion. So you don't think the government had any obligation to connect the dots at all, to say what the purpose of this enterprise was, that was a purpose involved in helping each other to commit crimes? Oh, no, I'm saying they had the obligation. And I think, you know, when you review the closing argument, that's exactly what the prosecutor attempted to do using the Boyle framework. Here you have a purpose. You know, it's not like half of them were robbing banks. I mean, they were really all in on this. They celebrated together on social media. You know, there was evidence that one prostitute once worked for a Blackmaw member, then a scandalous member. That was the breezy. I mean, you know, it was all cumulative evidence, Your Honor. Maybe when you look at each piece in a vacuum, it may not be the strongest thing. But our point is that under a sufficiency review, looking at the light, you know, the evidence in the light most favorable to verdict, that that would be sufficient. Did the defense argue that they were just individual entrepreneurs? I believe they did. Was that their? Yes. And the jury rejected that. It seems to me that as we look at the evidence and hear the arguments challenging its impact or its admissibility, part of what we're looking at is a case that must have been extraordinarily difficult for everybody to try, including the judge, because you had a lot of people initially charged. You had a very long delay. You had one dead officer. You had a couple of the prostitutes whose memories were indistinct at best. And you had, therefore, to rely on sort of substitute evidence experts. You had to rely on media, the things that had been preserved. And so it was a hard case to try. It was. And, you know, I just want to pick right up on that. I mean, you know, I don't believe that – I know that there's been a lot of talk that this was improper. Right. So the question is, does that make it improper to try, given the kind of evidence you had to use in lieu of the evidence that time had obliterated or weakened? Well, you know, I would disagree, Your Honor. If I hear your question correctly, the way I see it, you had all the evidence from the victims, the law enforcement. The experts were there to supplement. Brooks, Taylor, I think those are the cases. This is not new. You know, this Court has long held that expert testimony on these matters is helpful because, and I believe there's a quote from one of them, that the relationship between a pimp and a prostitute is not something that's within the ken of an average juror. And here, you know, we should hope not. If we assume you're right, though, about the experts, the text messages, there's a lot of evidence that these individuals were engaged in pimping. What do the videos add in terms of probative value that outweighs the prejudice given the background that there's not really a question that these people were engaged in pimping and the videos seem very inflammatory? Well, I would say the following, Your Honor. The issue here was enterprise, and we needed to show, you know, people working together. There are things, ways that a video can show something that a flat picture cannot. So I guess this sort of does, this is why I keep thinking these issues are tied together. Can you point to something in one of the videos that shows that they are actually working together as opposed to that the videos are just celebrating pimping the way writing a book would be? Well, I thought, you know, in one of them when I reviewed it in preparation for this argument, you have a scene where there's both a black mob member to scan this saying, you know, we did this, we paid for all, you know, pimping paid for all of this. I mean, they're together and they're celebrating what they do. And, you know, in order to. . . What they did together? What they did together, yeah. And they commonly use the words we. In fact, I believe the prosecutor in closing argument said, if you listen to this, it's never I did this, black mob did this, scan list did this. It's consistently we. The other thing is, you know, you look at those videos. I mean, the first one, the one that I referred to, I believe it was first in sequence. So, I mean, I think I've watched that video and I think they do say like we got this money from pimping, but that doesn't mean they worked together to help each other with the pimping. Well, and I understand, you know, Your Honor has issues with our evidence. I wish I could make a better case for it, but I would say that all falls under what the jury heard. You know, we still. . . The question is, is it sufficient to show this element of a RICO? Right. But I know, you know, our opponents, too. I mean, these videos, you know, let's talk about the players' ball videos, too. You know, these aren't things that the government made. The government didn't put a gun to the heads of the defense and say, you know what? You are pimps for decades. You're going to go out and voluntarily choose to celebrate this lifestyle with these kind of. . . And they were brief clips. Even in closing argument, the prosecutor said, I'm not going to belabor the point. And it's interesting, too. There were a bunch of flat picture. . . You know, I keep saying flat. I'm sorry. To distinguish from a video, still photographs that were admitted that there's no dispute on appeal. But that is why, in part, the videos seem so just inflammatory because there wasn't really a question that these guys were engaged in at least individual pimping. And the videos are very offensive. But that doesn't mean they show that they were working together as opposed to working as individual pimps. So on this issue, I just am not sure. . . If that was the issue, I'm not sure what the videos were supposed to do. They don't have to show. . . You don't have to show that two people were on them, were running the same. . . They were all running the same. Together, no. Together. The acts of prostitution were. . . Each one was done by. . . Was being run by all the people. Right. And, in fact, we. . . You know, as we pointed out in the jury instructions, too. . . I mean, we didn't even have to prove that these two defendants themselves personally committed the RICO acts. But for purposes of enterprise. . . And I know in our brief we cited cases from other circuits. This also is not without precedent. To the extent it shows. . . You know, people coming together. And they were not cumulative of other pictures, Judge Feeley. You know, that's one point I wanted to clarify what I said a minute ago. I'm just saying when you talked about the still photos of activity that these defendants chose to engage in. . . There was no. . . Or, you know, at least not on appeal. That's not renewed. So another point we. . . Of course, we would have is that even if this court found issue with those videos. . . Because they certainly weren't numerous enough or long enough in quantity. . . To give. . . To give pause about reversible error would be our. . . So, could you describe what kind of purpose you think you did need to show? Yes, well. . . There was a conspiracy to promote an unlawful activity that these two defendants joined in. . . Knowing and having the intent to promote that. And that at least two other people would. . . You know, commit racketeering acts. And as far as the purpose. . . I look at Boyle, the three factors. You know, the common purpose here. As I said, although there was evidence about some drug deals and other things. . . The unifying point was the pimping and the prostitution. And they bragged about it jointly, I guess. They bragged about it. They helped each other out when they were in trouble with law enforcement. They shared prostitutes. But if the purpose is to promote prostitution. . . As opposed to a purpose to collectively engage in prostitution. . . I think there needs to be some sort of working together, doesn't there? So promoting. . . I think working together to promote. . . I'm just having a real problem with how that contributes to the crime. How that's furthering an enterprise of racketeering activity. If all you're doing is writing books and celebrating and writing songs. I think here the racketeering charge is the pimping, Your Honor. The evidence that shows them promoting it is what folds into their knowledge and intent requirements. And I gather your argument comes down to that helps you, but it's not all there is. There's also evidence of sharing prostitutes, of rides, of at least on occasion offering to assist if somebody else gets arrested. Yes. Is that necessary to your case? It's a good. . . I would say that's a good summary of our case. But is there enough frequency to those incidents of sharing to support a finding of a sufficient connection to the enterprise itself? I mean, that's obviously a good question, too. And, you know, in some respects this case is a little sui generis. I did the best I could to find. . . You know, I don't know. . . I would say it's enough, especially under the liberal standard of review. It's a sufficiency challenge that the jury heard, you know, all the facts. They were allowed to make that decision. Our position is that it is enough. And they were a gang. There's no question about that. Yes. Two separate gangs. Correct. And with a sub . . . Click or a subset, yes. A subset or a fully owned corporate subsidiary that was called Fuckabitch. Yes. So not all of the members of Black Mob Scandalous were charged, right? Correct. So do you have any understanding of how many members there were? I think 24 were charged. But how many members . . . how many people were in Black Mob Scandalous? Boy, you know, and I ought to know. I'm sorry. With all the facts in this case, that I just don't know off the top of my head, Your Honor, and I'm not going to . . . Does a precise number . . . what's the impact of a precise number? I mean, perhaps the more there are, the further attenuated from specific coordinated action, but there has to be a certain number in order for there to be . . . Well, the larger . . . . . . who were actually indicted is not insignificant, but what . . . how does that cut? Well, I think here, again, we have to ask under the lens, is it, you know, sufficient? It doesn't have to be the greatest case, necessarily. It just has to be sufficient. I think you had 24 people, you know, upwards of somewhere in the 20s. Most of them pled guilty. Here you . . . but, you know, here you have this evidence of a lot of the . . . You know, it's in the appendix. That's where I tried to lay it out so that I wouldn't have to repeat it every time. So the prosecution defined a very large number of people. It was more than 24, I think, for the social media, et cetera. And so they were able to bring in the social media for this very large number of people. So in order to justify doing that, don't you need evidence that all of those people in the very large number, beyond the 24, had really agreed to enter an enterprise together for a purpose? And I don't understand what that evidence was. Well, and I think, you know, at one point below two, the prosecutor made clear that they didn't charge. This wasn't just like, you're a member of this gang, therefore you're part of the enterprise. And my understanding, too, is that every piece of social media that came in was from somebody who was either a charge or an unindicted conspirator. There was not a lot of, if any, fixation . . . But unindicted conspirators were all of Black Mob Scandalous, right? Not all of them, because that's . . . and, you know, because we face charges that . . . Well, so if not all members of Black Mob Scandalous were involved, then how is Black Mob Scandalous the enterprise? Well, because these people, you know, the ones who were charged, were all members of Black Mob or Scandalous. So your argument is that at least these people used the Black Mob Scandalous organization to achieve their criminal purpose. That is my understanding. Is that your argument? Yes. So I have one last question, and not directly related to this. Let's assume, for the purpose of argument, that we find the evidence insufficient to support the RICO convictions.  Brown. Brown. One has served its time. One is going to be released in February. Correct. Will the government ever retry this case? Do we need to worry about a remand in a very practical way? This is my district court judgment coming out. Right. I mean, I can't, you know, I can't speak for the government, but I would not see that, Your Honor, yeah. The evidentiary problems would only have increased. Correct. This was, we put the best case forward that we did at the time. And actually, if I could segue to the pre-indictment delay, unless you have no other questions, so. I don't know that we need it. No, I don't have any questions about that. I think you can stand on your argument. Thank you, Your Honor. Thank you. So I think we've. So I will give Banks' counsel two minutes for rebuttal, even though we took you over. So I don't know if that affects the coordination you're doing right now. You have a minute left, and I'm going to give you two minutes. Thank you very much. Thank you. Thank you. I'll try to be fast. First of all, I didn't get a chance to address the statute of limitations issue, which the issue is one of congressional intent. Congress did not express an intent that this, that its revised statute of limitations should be retrospective in this case. The Ninth Circuit has never held that to the contrary. The Third Circuit case of Richardson is directly on point. This statute would have run but for the subsequent amendments to the statute, and those amendments do not run retroactively. With respect to some of the evidence and the sufficiency question, that is my co-counsel's issue. However, I wanted to point out that much of the enterprise evidence that you're on are addressed in terms of the way that this case had to be presented because of some of the difficulties and the delay came from Detective Johnson, who was a hearsay conduit testifying as to what he saw on Facebook and what he had been told by other agents almost exclusively. He acted as a gang historian. He offered opinions as to how the gang functions, and he did all of that based on what he was told by other officers, by prostitutes and pimps and gang members, and based on what he read on Facebook. That is not proper testimony for someone who is not an expert witness. Just as one quick point, there was a discussion of the sharing of prostitutes. I tried this case. There was no sharing of prostitutes that I recall in any instance. There were prostitutes who changed pimps, but they fought over that. They competed over that. It was a competition. It was a competition. There was never any sharing of women. That did not happen. Was that part of just the gang's operation, that they didn't share women? No, I think that's a pimping thing, and I believe we had expert testimony from the government on that point, that pimping is a solitary activity that pimps don't share. They compete. Then finally, there was a question about Black Mob as a documented gang. Scandalous was not a documented gang. We didn't really contest the distinction between dance clique and gang below. Clearly, it's a collection of people that hang out and do things. I thought there was evidence that the women moved from one gang member to another or something like that. Yes, but they weren't sharing them. That was a gang thing. They stayed within the gang. They called it choosing up, basically. They fire their pimp and choose another one. But wasn't the evidence that they chose up within Black Mob scandalous members? I think the evidence was they just chose up with whoever happened to be there. I don't think that there was any— And they happened to be Black Mob scandalous members, based on what we see in the record, that one prostitute moving from Banks to Brown or Brown to Banks. Then finally, I know the court is not keen on this issue, but my co-counsel just handed me this passage from what the district court observed, where he said, No reported case has been found in which the federal government adopted and resurrected a local police department's 11-year-old criminal investigation with the intent to use local law enforcement officers and witnesses developed during the course of that local investigation to support three substantive charges and an overt act, including a RICO indictment, all the while knowing that videotaped witness statements related to those charges were destroyed prior to or at the time the local case was adopted. Thank you. Thank you. Thank you, Your Honors. Before I get into the RICO, I just want to briefly state that as to the arrest and traffic detention, in the reply I cite to the record to show that there was no waiver. There was a full-on motion with regard to the Fourth Amendment, and at the hearing, the attorney for Mr. Banks, who is not me, specifically said that he attacked the detention when he was put in handcuffs and put in the back seat of the car. But he doesn't say probable cause to arrest. I'm challenging whether there was probable cause to arrest. In the motion, they say it is the government's burden to justify any arrest, detention, seizure, and they must either show probable cause or an exception. So in the motion, they lay out this is the government's burden. They have to either show probable cause, reasonable suspicion, or an exception. So I think they did, just in the motion, not those specific words at the hearing. Going on to the RICO, first of all, to pick up on the sharing of the prostitutes, there was evidence that Yesenia Armentaro chose people who were named who I don't believe had any connection to Black Mob or Scandalous. In addition, the evidence was that the prostitutes made the decisions on who was going to be their pimp. If there had been evidence that banks said to Brown, I'm going to give you Breezy, then that would be evidence of the enterprise or a joint venture, but that was not the evidence. The evidence was solely with regard to the prostitutes choosing and making decisions about who they wanted to go to, who they wanted to be their pimp, and that was also corroborated by their expert. As to YP Fab, the young pimp, fuck a bitch, very offensive name, Mr. Banks was never a member of that. That was a sub-click. And that, incidentally, was where they began their investigation, and then they just kept sort of expanding it. And our position is that they just got greedy. They just got greedy, and they just kept wanting to bring all these people, so-and-so committed a robbery and so-and-so committed a murder and this guy was a pimp and that guy was a pimp, let's bring them all together. They're all from North Park. They're all African American. As to the shared rides, those were two incidents within one year. The RICO requires more than two years for longevity, and at the closing argument, the prosecutor in the opening closing actually told the jury that after that they went their separate ways. Banks and Brown? Banks and Brown. One of them moved to Arizona. Right. Brown moved to Arizona. She realized that she had made a mistake and started backpedaling and saying, well, not really went their separate ways, but they sort of developed different business styles. But she was right. They went their separate ways, and they did their own thing in different places and with different- And that was argued. That was the prosecution's argument. I mean, that was the slip of the tongue. Yeah. Well, how long after the allegedly illegal activities began did one move to Arizona? That I don't know. That I don't know. As to the- The day before that occurred, I take it, when they were not geographically separate. It was some period after the 2001 arrest, but before the arrest in this case. But I just don't know exactly when he moved. That would be Brown. Again, the player's balls, those are videos that are made by Real Flava. Don't even know who that is. And they just profile various pimps. There is no mention of Scandalous, BMS, or North Park. And, in fact, in the sort of awards acceptance speech of Mr. Banks, he nowhere thanks his homies in North Park. He doesn't talk about Scandalous or BMS, and he doesn't promote them. He's not bragging for them. Yeah. But these are arguments that were made to the jury as to these weaknesses. Right, and we would contend that, you know, with the onslaught of testimony about guerrilla pimps, finesse pimps, mind control, the playing of a video with the emotional music about the mind control, the videos from the player's balls that represented women in incredibly offensive postures. And they even played a clip. They played one of those player's balls clips during the expert testimony and during closing when no one in that clip was at all related to anyone in this case. The clip where they talk about how the prostitute is looking away because she's not allowed to make eye contact, neither the prostitute nor the pimp featured in that click have any connection to this case other than it's a pimp, and that's it. And that was played in closing and also during the expert's testimony. I think we've taken you way over, so I better stop you. Thank you very much. Thank you, both sides, for the helpful arguments. These difficult cases are submitted.
judges: Schroeder, Friedland, Rosenthal